## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

ALAN SPAULDING,

                              Plaintiff,

              v.

ANDREW SAUL,[1]
Commissioner of Social Security,

                              Defendant.

**CIVIL ACTION
No. 4:18-cv-10477-TSH**

## REPORT AND RECOMMENDATION

### January 21, 2019

Hennessy, M.J.,

Pursuant to 42 U.S.C. § 405(g), Plaintiff Alan Spaulding moves to reverse the Commissioner's decision to partially deny his application for Social Security Disability Insurance Benefits ("SSDI") and Supplemental Security Income ("SSI") under Title II and Title XVI of the Social Security Act (the "Act"). [Dkt. No. 15]. The Commissioner, in turn, moves for an order affirming his decision. [Dkt. Nos. 23-24]. The motions are ripe for adjudication. For the reasons stated below, undersigned recommends that the Commissioner's motion be DENIED, and Plaintiff's motion be GRANTED.

---

[1] Plaintiff commenced the instant action against Nancy Berryhill, who at that time was the Acting Commissioner of the Social Security Administration. Andrew Saul was sworn in as Commissioner of the Social Security Administration on June 17, 2019. See Jim Borland, Social Security Welcomes its New Commissioner, SOCIAL SECURITY ADMINISTRATION BLOG (June 17, 2019), https://blog.ssa.gov/social-security-welcomes-its-new-commissioner/. Andrew Saul has been automatically substituted as the party defendant in this action. See Fed. R. Civ. P. 25(d) ("An action does not abate when a public officer who is a party in an official capacity . . . ceases to hold office while the action is pending. The officer's successor is automatically substituted as a party. Later proceedings should be in the substituted party's name, but any misnomer not affecting the parties' substantial rights must be disregarded. The court may order substitution at any time, but the absence of such an order does not affect the substitution."); see also 42 U.S.C. § 405(g) (noting that an action survives notwithstanding any change of the official occupying the office of Commissioner of the Social Security Administration).

## I.     **PROCEDURAL HISTORY**

Plaintiff was born in 1965 and was forty-five years old at the time he applied for SSDI and SSI benefits on June 7, 2010.  Plaintiff graduated high school and is fluent and literate in English.  [AR 66-67].  Plaintiff worked two job in the fifteen-year period prior to his alleged onset date of June 1, 2008.  From 1997 to 2002, Plaintiff worked as a sander in a furniture manufacturing company.  [AR 414].  From 2004 to 2008, Plaintiff worked as a line packager for a printing company in which he had to lift boxes in excess of thirty-five pounds.  [AR 63-64, 414].

Plaintiff asserts an onset date of June 1, 2008.  [AR 446].  At the time of Plaintiff's initial SSDI and SSI application, Plaintiff alleged disabilities related to lower extremity blood clots, learning disabilities, leg pain, asthma, anxiety, hearing loss, and back pain, among others.  [AR 446].  On October 12, 2010, the Commissioner denied Plaintiff's claim after initial review [AR 129] and subsequently upon reconsideration.  [AR 132].  Following initial review, Plaintiff requested a hearing before an administrative law judge ("ALJ").  [AR 215-16].  On May 17, 2012, the Commissioner held a hearing at which Plaintiff testified and was represented by counsel.[2]  [AR 109-128].  A vocational expert ("VE"), Jeff R. Blank, Ph.D., also testified and answered questions from the ALJ and from Plaintiff's attorney.  [AR 125-28].  On June 8, 2012, the ALJ issued a decision denying Plaintiff's entitlement to benefits under Title II or Title XVI.  [AR 136-146].  On August 7, 2012, Plaintiff timely appealed his denial of benefits to the Appeals Council ("AC").  [AR 273].  On May 6, 2013, the AC granted Plaintiff's request for review and vacated the June 8, 2012 decision.  [AR 152-54].  The AC remanded to allow the ALJ to evaluate the severity of Plaintiff's hearing impairment, give further consideration to Plaintiff's maximum residual

---

[2] The honorable Judith M. Stolfo issued the first two decisions denying Plaintiff's entitlement to benefits and the honorable Peter J. Martinelli issued the third decision partially granting Plaintiff's entitlement to benefits.  As the third decision is the final decision of the Commissioner, unless otherwise noted, when referring to the ALJ's decision, undersigned refers to Judge Martinelli's February 9, 2017 decision.

functional capacity ("RFC"), and obtain supplemental evidence from a VE to clarify Plaintiff's limitations on his ability to perform work.  [AR 152-54].

On February 20, 2014, the Commissioner held a second hearing at which Plaintiff and Dr. Blank again testified.  [AR 84-100].  At that time, Plaintiff alleged disabilities related to lumbar-spine pain/polyarthralgia, hearing loss, glaucoma, obstructive sleep apnea, among others.  [AR 459-460].  At the hearing, Dr. Blank again testified and answered questions from Plaintiff's attorney.  [AR 94-95].  On April 10, 2014, the ALJ issued a second decision denying Plaintiff's entitlement to benefits.  [AR 159-71].  Plaintiff timely appealed the second denial to the AC.  [AR 319].  On November 9, 2015, the AC vacated the April 10, 2014 decision.  [AR 179-80].  On remand, the AC instructed the ALJ to further assess the impact of Plaintiff's severe mental impairments on his remaining ability to perform work-related mental activities and obtain supplemental evidence from a VE.  [AR 179].

For the third hearing, Plaintiff alleged disabilities related to vision impairments, hearing loss, osteoarthritis, asthma, and degenerative joint disease among other disabilities previously argued.  [AR 469-70].  On May 6, 2016, the Commissioner held a hearing at which Plaintiff testified and was represented by counsel.  [AR 57-80].  Elaine G. Cogleono, C.R.C., testified as a VE.  [AR 74-79].  Plaintiff's counsel did not cross-examine her.  [AR 74-79].

On February 9, 2017, the ALJ found Plaintiff disabled on and after May 27, 2015, the date on which Plaintiff turned fifty years of age.  [AR 45].  The ALJ found that prior to that date, jobs existed in significant numbers in the regional and national economies that Plaintiff could have performed.  [AR 46].  Relying on the testimony of VE Cogleono, the ALJ found that Plaintiff could have performed the work of small parts assembler (Dictionary of Occupational Titles 713.687-018), inspector (Dictionary of Occupational Titles 739.687-182), and packaging sealer

(Dictionary of Occupational Titles 559.687-014).  [AR 46].  Accordingly, the ALJ found that Plaintiff was not disabled under the Act prior to his fiftieth birthday.  [AR 46].  Consistent with his partial grant of benefits, the ALJ awarded Plaintiff $10,754.73 in back pay from May 27, 2015 and continuing monthly payments of $490.  [AR 12].

On March 6, 2017, Plaintiff appealed the unfavorable portions of the ALJ's February 9, 2017 decision.  [AR 369-70].  On January 18, 2018, the AC denied Plaintiff's request for review making the February 9, 2017 decision the final decision of the Commissioner.  [AR 1-6].  On March 13, 2018, Plaintiff filed a complaint in this court seeking review of the Commissioner's decision pursuant to 42 U.S.C. 405(g).  [Dkt. No. 1].  On October 2, 2018, Plaintiff filed a motion for an order reversing the Commissioner's decision.  [Dkt. No. 15].  On December 28, 2018, the Commissioner moved to affirm.  [Dkt. No. 23].  On October 3, 2019, Judge Hillman referred the case to the undersigned for a report and recommendation on the parties' cross-motions.  [Dkt. No. 27].

## II.  SELECTED MEDICAL AND OPINION EVIDENCE

### A.  Eye Impairment Medical Evidence

On August 31, 2013, Plaintiff's primary care physician, Bryan Miller, M.D., referred Plaintiff to D'Ambrosio Eye Care for glaucoma testing.  [AR 908].  On September 12, 2013, ophthalmologist Bin Wu, M.D., a D'Ambrosio Eye Care employee, assessed Plaintiff as being a "glaucoma suspect."  [AR 1092-95].  During May 5, 2014 and July 8, 2014 examinations, Plaintiff denied worsening symptoms.  [AR 1060, 1086].

At an October 11, 2014 appointment, Plaintiff reported experiencing new floaters which subsided by the time of his appointment.  [AR 1050].  On March 23, 2015, Plaintiff informed Dr. Wu that he had been experienced worsening visual acuity with occasional pain and pressure.  [AR

1045]. Dr. Wu recommended Selective Laser Trabeculoplasty ("SLT") to address Plaintiff's complaints. [AR 1048]. On April 17, 2015 and May 13, 2015, Plaintiff underwent SLT to treat his borderline glaucoma and ocular hypertension. [AR 1037-42]. On June 9, 2015 and October 16, 2015, Plaintiff did not report any pain, pressure, or changes in visual acuity. [AR 1025-1030].

On December 24, 2015, Plaintiff reported experiencing floaters, dryness when using artificial tears, distorted distance vision, and reduced visual acuity. [AR 1019-1024]. On January 26, 2016, Dr. Wu diagnosed Plaintiff with dry eye syndrome secondary to tear deficiencies. [AR 1014-1017]. On March 28, 2016, Dr. Wu implanted silicone plugs to treat Plaintiff's dry eye syndrome. [AR 1010-1012].

### B. Mental Health Opinion Evidence

The administrative record contains four assessments of Plaintiff's mental health impairments.

#### 1. Dr. Kriedberg

Following a referral from the Disability Determination Services ("DDS") Division of the Massachusetts Rehabilitation Commission, Psychologist Gerald N. Kriedberg, D.Ed., examined Plaintiff on September 28, 2010 for a psychodiagnostic interview and for an intellectual assessment. [AR 487]. Dr. Kriedberg reported that Plaintiff presented as alert and oriented with clear and coherent speech. [AR 487]. Plaintiff reported being anxious, stressed, and experiencing periods of anger. [AR 487]. Plaintiff denied any delusions, hallucinations, history of depression, or history of substance abuse. [AR 487].

When evaluated on the adult attention deficit disorder scale, Plaintiff rated himself on twenty-five specific behaviors. [AR 488]. Dr. Kriedberg stated that Plaintiff presented with attention deficit hyperactive disorder-related behaviors to a large or very large degree. [AR 488].

Dr. Kriedberg also assessed Plaintiff's verbal cognitive skills.  [AR 489].  The results of the test indicated that Plaintiff's index score fell at the sixteenth percentile for verbal comprehension, the twenty-fifth percentile for perceptual reasoning, the thirty-seventh percentile for working memory, and the tenth percentile for processing speed.  [AR 489-90].  Overall, Plaintiff's Full-Scale I.Q was in the fourteenth percentile which equates to "the low average range of ability."  [AR 489].

Dr. Kriedberg diagnosed Plaintiff with adjustment disorder with anxiety, attention deficit hyperactive disorder ("ADHD") – inattention hyperactivity, and with a reported history of learning disability.  [AR 491].  Dr. Kriedberg assigned a Global Assessment Functioning ("GAF") score of 50.[3]  [AR 492].  Dr. Kriedberg did not provide an opinion as to Plaintiff's RFC or the impact of Plaintiff's mental health diagnoses on his ability to perform work-related activities.

2.    Dr. Whitehorn

A DDS consultant, Joseph A. Whitehorn, Ph.D., reviewed Plaintiff's treatment records on October 12, 2010.   [AR 493-509].   Dr. Whitehorn determined that Plaintiff suffered from medically determinable impairments of ADHD [AR 494] and adjustment disorder with anxiety. [AR 498].  Using the then-applicable Paragraph B criteria, Dr. Whitehorn opined that Plaintiff had "mild" restrictions of activities of daily living, "moderate" difficulties maintaining social functioning, "moderate" difficulties in maintaining concentration, persistence, or pace, and had experienced no episodes of decompensation.  [AR 503].  Dr. Whitehorn provided the summary conclusion that Plaintiff's memory and understanding were adequate for simple tasks.  [AR 509]. He further opined that Plaintiff was able to "sustain pace and focus on simple tasks for two hour

---

[3] A GAF score is a number between 1 and 100 that measures "the clinician's judgment of the individual's overall level of functioning" with lower scores indicating lower levels of functioning.  AMERICAN PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 34 (4th ed. 2000).  A GAF score of 41 to 50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning.  Id.

periods during a work day," "adhere to social norms in a work setting," and "handle changes in simple work routines." [AR 509].

3.   Dr. Robbins

On February 21, 2011, DDS consultant Peter Robbins, Ed.D., reviewed Plaintiff's treatment records to provide an opinion as to Plaintiff's mental RFC. [AR 526-42]. Dr. Robbins determined that Plaintiff suffered from only one medically determinable impairment – adjustment disorder with anxiety under the applicable SSA criteria. [AR 531]. Dr. Robbins "ruled out" Plaintiff's diagnoses of ADHD and a reading disorder. [AR 542]. Using the then-applicable Paragraph B criteria, Dr. Robbins opined that Plaintiff had "mild" restrictions of activities of daily living, "mild" difficulties maintaining social functioning, "moderate" difficulties in maintaining concentration, persistence, or pace, and had experienced no episodes of decompensation. [AR 536]. In his narrative report, Dr. Robbins assessed that besides minor work conflict, "there is no indication of any significant emotional or behavioral problems or symptoms." [AR 542]. Dr. Robbins provided the summary conclusion that Plaintiff "will be able to recall and understand simple instructions," and "will be able to sustain concentration and adequate pace for simple tasks." [AR 542]. Dr. Robbins further opined that there were "no significant limitations" of the latter two Paragraph B criteria. [AR 542].

4.   Dr. Miller

On September 6, 2011, Plaintiff's treating physician Dr. Miller completed a medical source survey statement of Plaintiff's ability to do work related activity, accounting for Plaintiff's mental impairments. [AR 569-70]. Dr. Miller opined that Plaintiff had "marked" limitations in the ability to understand, remember, and carry out detailed instructions. [AR 569]. Dr. Miller also provided the opinion that Plaintiff had "marked" limitations in the ability to maintain attention and

7

concentration sufficient to perform work tasks throughout an eight-hour work day, to maintain

regular attendance and be punctual within customary tolerances, to sustain an ordinary routine

without special supervision, and the ability to work in coordination with, or in proximity to, others

without being distracted by them.  [AR 569].  For social interaction limitations, Dr. Miller opined

that Plaintiff had "marked" limitations in the ability to interact appropriately with the general

public, to accept instructions and respond appropriately to criticism from supervisors, and the

ability to get along with coworkers or peers without distracting them or exhibiting behavioral

extremes.  [AR 569-70].  Dr. Miller did not provide any diagnoses or clinical findings to support

his assessment.  [AR 570].

## III.   LEGAL STANDARDS

### A.   Standard of Review

The Act provides in pertinent part:

> Any individual, after any final decision of the Commissioner of Social Security
> made after a hearing to which he was a party, irrespective of the amount in
> controversy, may obtain a review of such decision by a civil action . . ..  The court
> shall have power to enter, upon the pleadings and transcript of the record, a
> judgment affirming, modifying, or reversing the decision of the Commissioner of
> Social Security, with or without remanding the cause for a rehearing.  The findings
> of the Commissioner of Social Security as to any fact, if supported by substantial
> evidence, shall be conclusive . . ..

42 U.S.C. § 405(g); see also 42 U.S.C. § 1383(c)(3).

Thus, "the court's function is a narrow one limited to determining whether there is

substantial evidence to support the [Commissioner's] findings and whether the decision conformed

to statutory requirements."  Geoffroy v. Sec'y of Health & Human Servs., 663 F.2d 315, 319 (1st

Cir. 1981).  "Substantial evidence is 'more than [a] mere scintilla.  It means such relevant evidence

as a reasonable mind might accept as adequate to support a conclusion.'"  Currier v. Sec'y of

Health, Educ. & Welfare, 612 F.2d 594, 597 (1st Cir. 1980) (quoting Richardson v. Perales, 402

U.S. 389, 401 (1971)).  Indeed, the court "must uphold the Secretary's findings 'if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion.'"  Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (quoting Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)).  Under such review, "[t]he ALJ's findings of fact are conclusive when supported by substantial evidence . . . but are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts."  Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (citing Da Rosa v. Sec'y of Health & Human Servs., 803 F.2d 24, 26 (1st Cir. 1986) (per curiam)).

### B.      Social Security Disability Standard

The Commissioner evaluates if an individual is disabled under the Act using a sequential five-step process:

> 1) if the applicant is engaged in substantial gainful work activity, the application is denied; 2) if the applicant does not have, or has not had within the relevant time period, a severe impairment or combination of impairments, the application is denied; 3) if the impairment meets the conditions for one of the 'listed' impairments in the Social Security regulations, then the application is granted; 4) if the applicant's 'residual functional capacity' is such that he or she can still perform past relevant work, then the application is denied; 5) if the applicant, given his or her residual functional capacity, education, work experience, and age, is unable to do any other work, the application is granted.

Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001) (citing 20 C.F.R. § 416.920).

"The applicant has the burden of production and proof at the first four steps of the process." Freeman v. Barnhart, 274 F.3d 606, 608 (1st Cir. 2001).  Once the applicant establishes the inability to perform any past relevant work, "the Commissioner then has the burden at Step 5 of coming forward with evidence of specific jobs in the national economy that the applicant can still perform."  Seavey, 276 F.3d at 5 (citing Arocho v. Sec'y of Health & Human Servs., 670 F.2d 374, 375 (1st Cir. 1982)).

IV.     **THE ALJ'S FEBRUARY 9, 2017 DECISION**

On February 9, 2017, the ALJ issued the Commissioner's third and final decision, partially granting Plaintiff's entitlement to benefits.  [AR 35].  In determining whether Plaintiff was disabled, the ALJ conducted the five-part analysis required by the regulations.  See 20 C.F.R. § 416.920(a).  At Step One, the ALJ found that Plaintiff met the insured status through December 31, 2013 and had not engaged in substantial gainful activity since June 1, 2008, the date of alleged disability onset.  [AR 38].  The ALJ noted that Plaintiff worked after June 1, 2008; however, the ALJ determined that such employment did not qualify as substantial gainful activity.  [AR 38-39].  At the second step, the ALJ found that Plaintiff suffers from six severe impairments: varicose veins, right-sided hearing disorder, degenerative disc disease of the cervical and lumbar spine, asthma, history of learning disorder/ADHD, and adjustment disorder with anxiety.  [AR 39].  At Step Two, the ALJ did not assess the severity of Plaintiff's alleged impairments of borderline glaucoma or combined visual impairments.  [AR 39].

At Step Three, the ALJ concluded that Plaintiff did not have an impairment, or combination of impairments that equals the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  [AR 39-40].  Using the post-2017 criteria, the ALJ considered the so-called "Paragraph B" criteria applicable to mental health impairments and found that Plaintiff has "mild" difficulty in activities of daily living [AR 40], "mild" difficulties in social functioning [AR 40], and "moderate" difficulty in concentration, persistence, or pace [AR 40].  The ALJ found that Plaintiff had no limitations in adapting and managing himself.  [AR 40].  In consideration of the "Paragraph C" criteria, the ALJ found that Plaintiff suffered no episodes of decompensation of extended duration.  [AR 40-41].

Before continuing to Step Four of the analysis, the ALJ assessed Plaintiff's RFC.  [AR 41]. The ALJ determined that Plaintiff had the RFC to perform less than the full range of sedentary work with additional limitations of:

> [A]t least one-third of the day, on an as needed basis, [Plaintiff] should be allowed to stand up and stretch; occasional pushing and pulling with the upper and lower extremities; occasional climbing, balancing, and stooping; must avoid kneeling, crouching, and crawling; must avoid all exposure to temperature extremes, hazards, and loud background noises; limited to simple, one-to-two step tasks that are taught by demonstration and involve rare changes in routine.

[AR 41].

In making this assessment, the ALJ reviewed Plaintiff's history of mental impairments. [AR 43-44].  The ALJ considered the evaluation of Dr. Kriedberg, but he acknowledged that Dr. Kriedberg did not provide an opinion as to Plaintiff's functional limitations.  [AR 44].  The ALJ found that Dr. Miller's opinion as to Plaintiff's mental functional limitations had "no probative value" because Dr. Miller is not an expert in mental health treatment and Dr. Miller's opinion was not supported by any objective evidence.  [AR 44].  The ALJ did not cite the evaluations of Dr. Whitehorn or Dr. Robbins in his decision.

At Step Four, the ALJ found that Plaintiff was unable to perform his past relevant work. [AR 45].  The ALJ then proceeded to Step Five.  [AR 44-45].  The ALJ found that upon Plaintiff's fiftieth birthday on May 27, 2015, there existed no job in significant numbers in the national economy that he could have performed.   [AR 46-47].   However, considering Plaintiff's age, education, work experience, and RFC, prior to his fiftieth birthday, Plaintiff could have performed three jobs that existed in significant numbers in the national and regional economies: small part assembler (Dictionary of Occupational Titles 713.687-018), inspector (Dictionary of Occupational Titles 739.687-182), and packaging sealer (Dictionary of Occupational Titles 559.687-014).  [AR 46].  Consequently, the ALJ concluded that Plaintiff was disabled starting May 27, 2015, but

Plaintiff was not disabled from June 1, 2008 through December 31, 2013, the date of last insured.
[AR 47].

## IV.   <u>ANALYSIS</u>

Plaintiff challenges the Commissioner's final decision on four primary grounds.  At Step Two, Plaintiff argues that the ALJ failed to properly consider Plaintiff's alleged combined visual impairments.  At Step Three, Plaintiff asserts that the ALJ erred by failing to rely on medical opinions using updated Social Security Administration criteria.  Plaintiff further contends that the ALJ's RFC assessment for Plaintiff's mental impairments is not supported by substantial evidence.  Lastly, Plaintiff challenges the ALJ's Step Five determination because he assigns error to the ALJ's reliance on VE testimony.  Undersigned addresses Plaintiff's arguments in turn.

### A.   **The ALJ's Step Two Finding**

At Step Two of the disability evaluation process, "the claimant has the burden of proving, through objective medical evidence, that [his] impairments are severe."  <u>Teves v. McMahon</u>, 472 F. Supp. 2d 82, 86 (D. Mass. 2007).  "Under the Social Security regulations, an impairment or combination of impairments is considered severe if it 'significantly limit[s] [the claimant's] physical or mental ability to do basic work activities.'"  <u>Rascoe v. Comm'r of Soc. Sec.</u>, 103 F. Supp. 3d 169, 173 (D. Mass. 2015) (quoting 20 C.F.R. § 404.1520(c)).  Thus, "regardless of how many symptoms an individual alleges, or how genuine the individual's complaints may appear to be, the existence of a medically determinable physical or mental impairment cannot be established in the absence of objective medical abnormalities, *i.e.*, medical signs and laboratory findings."  Social Security Regulation 96-4p (July 2, 1996) (rescinded effective June 14, 2018).

Here, Plaintiff assigns Step Two error to the ALJ's failure to find Plaintiff's combined visual impairments severe.  Plaintiff is correct that the ALJ did not conduct an explicit Step Two

analysis of Plaintiff's visual impairments.  [AR 39].  However, the Commissioner persuasively argues that the longitudinal medical evidence does not show that Plaintiff's visual impairments significantly impacted Plaintiff's ability to perform basic work activities.  See Ramos v. Barnhart, 60 Fed. Appx. 334, 335 (1st Cir. 2003) ("a claim may be denied at step 2 . . . where medical evidence establishes only a slight abnormality . . . which would have no more than a minimal effect on an individual's ability to work, even if the individual's age, education, or work experience were specifically considered . . ..").

Throughout the near entirety of Plaintiff's evaluations by his primary care physician, Dr. Miller, Plaintiff did not report any eye-related symptoms.[4]  [AR 593, 595, 625, 629, 632, 700, 836, 841, 860, 868, 935, 968, 971, 976].  The record's first relevant medical evidence of an eye impairment was on September 12, 2013 – approximately three months before his date of last insured – when Plaintiff began being monitored for suspicion of glaucoma.  [AR 1092-95].  At this first examination, Plaintiff did not report any pain, pressure, flashes, floaters, or changes in visual acuity.  [AR 1092].  Though he received further examinations [AR 1086, 1060], it would not be until October 11, 2014, after the date of last insured, that Plaintiff reported symptoms which could have reasonably impacted Plaintiff's ability to perform work-related activities.  [AR 1050 (Plaintiff reported new floaters which subsided by the time of the examination)].  In 2015 and 2016, Plaintiff continued to undergo treatment for borderline glaucoma, ocular hypertension, and dry eye syndrome.  [AR 1045, 1037-42, 1019-1024, 1014-1017, 1010-1012].  If these conditions impacted Plaintiff's ability to perform work related activity, there is no objective evidence that Plaintiff suffered from these symptoms before the date of last insured of December 31, 2013.

---

[4] In 2007, Plaintiff suffered an eye abrasion injury requiring emergency medical treatment.  [AR 755-767].  In 2014, Plaintiff suffered from an acute eye injury related to an infection.  [AR 1054-1082].  Plaintiff does not assert that these injuries contributed to a functional impairment.

Plaintiff's reviewing and treating physicians were also unable to provide opinions that Plaintiff's visual impairments impacted his ability to work.  [AR 72-73, 482, 549, 567].  Plaintiff argues that Dr. Miller's December 30, 2013 opinion is a favorable source of evidence.  [Dkt. No. 15, at p. 5].  However, it is clear that Dr. Miller was merely identifying Plaintiff's reliance on eyeglasses, not that Plaintiff's other eye-related symptoms prevented him from working.  [AR 1000].  The medical records from D'Ambrosio Eye Care do not provide any opinion as to Plaintiff's functional limitations either.  Such a dearth of evidence in the record only demonstrates that Plaintiff failed to meet his Step Two burden for his alleged combined visual impairments and that the ALJ did not err.  See Grady v. Astrue, 894 F. Supp. 2d 131, 142 (D. Mass. 2012) (noting that "[a] plaintiff's description of symptoms and limitations cannot by itself establish disability; the ALJ must also consider objective medical evidence and any other available evidence, such as medications and daily activities, to determine whether the plaintiff's testimony is consistent with the remainder of the record");  see also Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 656 (1st Cir. 2000) ("remand is not essential if it will amount to no more than an empty exercise.").

## B.    The ALJ's Step Three Finding

Next, Plaintiff claims that at Step Three, the ALJ erred by making a finding that was not supported by substantial evidence.  At Step Three, the ALJ determined that Plaintiff's severe impairments of learning disorder/ADHD and adjustment disorder with anxiety did not meet or equal the severity of an impairment on the Social Security Administration's ("SSA") list of impairments that are *per se* disabling.  Plaintiff's Step Three challenge is focused on the ALJ's use of several criteria that the SSA amended over the course of this case's procedural history.  Specifically, Plaintiff asserts that the ALJ could not have properly made his Step Three

determination without the benefit of expert RFC assessments using criteria which the SSA updated in 2017.

As noted above, the record contains four expert evaluations of Plaintiff's mental health impairments – Dr. Kriedberg in 2010, Dr. Whitehorn in 2010, Dr. Robbins in 2011, and Dr. Miller in 2011.  In 2010 and 2011, the DDS psychological consultants, Dr. Whitehorn and Dr. Robbins, performed their assessments of Plaintiff's mental RFC using the then-correct Paragraph B criteria. On January 17, 2017, the SSA began using new criteria for evaluating mental disorders, which would apply to all claims pending on, and all claims filed after, January 17, 2017.

Because the ALJ issued his decision in this case in February 9, 2017, he used the new Paragraph B criteria.  [AR 40]; see Revised Medical Criteria for Evaluating Mental Disorders, 81 Fed. Reg. 66138-01 (Sept. 26, 2016) ("When the final rules become effective, we will apply them to new applications filed on or after the effective date of the rules, and to claims that are pending on or after the effective date.").  Following a detailed analysis using these new criteria, the ALJ found that Plaintiff's mental impairments did not cause at least two "marked" limitations, and therefore, the post-2017 Paragraph B criteria were not satisfied.  [AR 40].

According to Plaintiff, remand is required because the ALJ's Paragraph B findings are not supported by substantial evidence.  He bases this argument on the fact that the ALJ used the new Paragraph B criteria but, necessarily, did not rely upon any expert opinion that assessed the severity of claimant's mental impairments under the new criteria.  See Nguyen, 172 F.3d at 35 ("As a lay person ... [an] ALJ [is] simply not qualified to interpret raw medical data in functional terms . . ..").  However, Plaintiff's argument that the Step Three finding in this case requires remand lacks authority.  Undersigned cannot find a single case where such an argument supported remand. Rather, another case recently decided in this circuit, Lord v. Berryhill, 18-CV-475 (LM), 2019 WL

4018308, at *7 (D.N.H. July 23, 2019), expressly rejected this very argument.  See also Benoit v. Berryhill, No. 18-CV-61 (SM), 2018 WL 6304353, at *8 (D.N.H. Dec. 3, 2018).  Moreover, the regulations themselves contemplate an ALJ using the new listings when evaluating pre-2017 mental health expert assessments.  See Lord, 2019 WL 4018308, at *7; see also Revised Medical Criteria for Evaluating Mental Disorders, 81 Fed. Reg. 66138-01, at n.1 (Sept. 26, 2016) ("If a court reverses our final decision and remands a case for further administrative proceedings after the effective date of these final rules, we will apply these final rules to the entire period at issue in the decision we make after the court's remand.").  As footnote one of the "Revised Medical Criteria" states, an ALJ is expected to use post-2017 Paragraph B criteria in a case remanded after the effective date, but otherwise wholly decided before it.  This contemplates an ALJ evaluating an RFC assessment using post-2017 Paragraph B criteria regardless of when the medical professional rendered that RFC assessment.  See Lord, 2019 WL 4018308, at *7.  Accordingly, the ALJ's use of pre-2017 RFC assessments in the ALJ's Step Three analysis did not require remand simply because the experts used outdated Paragraph B criteria.

### C.      The ALJ's RFC Determination

"With a few exceptions . . . an ALJ, as a lay person, is not qualified to interpret raw data in a medical record."  Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 17 (1st Cir. 1996).  Therefore, "where an ALJ reaches conclusions about claimant's physical exertional capacity without any assessment of residual functional capacity by a physician, the ALJ's conclusions are not supported by substantial evidence and it is necessary to remand for the taking of further functional evidence."  Perez v. Sec'y of Health & Human Servs., 958 F.2d 445, 446 (1st Cir. 1991).

Plaintiff argues that the ALJ's RFC finding lacks substantial evidentiary support because the ALJ rejected all medical opinions that assessed Plaintiff's mental functional limitations and formulated Plaintiff's RFC based on his lay opinion.  Commendably, the Commissioner concedes that this exact issue was the basis of remand in other cases.  [Dkt. No 24, at p. 22].  To that point, undersigned finds Oliveras v. Comm'r of Soc. Sec., 354 F. Supp. 3d 84, 91 (D. Mass. 2019), and the cases collected, directly applicable to the instant case.  In Oliveras, remand was required when the ALJ explicitly rejected all expert opinion in forming a claimant's RFC.  Id. at 91-92.

In this case, the ALJ did not rely on the opinion of any medical expert when crafting his RFC assessment.  As noted above, the ALJ expressly rejected the mental functional limitations found by Plaintiff's treating physician Dr. Miller.  [AR 44].  The ALJ did consider the assessment of Dr. Kriedberg, but the ALJ correctly noted that Dr. Kriedberg did not evaluate Plaintiff's RFC. [AR 44].  Thus, the ALJ could not have based his RFC finding on Dr. Kriedberg's diagnoses alone. See Gordils v. Sec'y of Health & Human Servs., 921 F.2d 327, 329 (1st Cir. 1990) ("[S]ince bare medical findings are unintelligible to a lay person in terms of residual functional capacity, the ALJ is not qualified to assess residual functional capacity based on a bare medical record.").  The ALJ did not discuss and – from all appearances – did not consider either of Dr. Whitehorn and Dr. Robbins' opinions.  Consequently, the ALJ's RFC determination is based, at best, solely on Dr. Kriedberg's bare medical notes.  Hence, the ALJ's RFC assessment was not supported by substantial evidence and the matter should be remanded.[5]  See Joyner v. Colvin, No. 13-CV-

---

[5] In support of his motion, the Commissioner cites Perry v. Astrue, No. 11-CV-40215 (TSH), 2014 WL 4965910, at *6 (D. Mass. Sept. 30, 2014) for the proposition that the ALJ "piece[d] together" the opinions of Dr. Robbins and Dr. Whitehorn to craft his RFC.  [Dkt. No. 24, at p. 25].  However, Perry is not analogous to this case because Dr. Whitehorn and Dr. Robbins provided very different opinions as to Plaintiff's diagnoses and RFC.  In Perry, the ALJ clearly relied on the identical opinions of non-examining state agency medical consultants for the claimant's RFC determination even if he did not explicitly cite to them.  Id. at *5.  Here, the opinions and diagnoses of Dr. Robbins and Dr. Whitehorn are inconsistent.  For example, Dr. Robbins disagreed with Dr. Whitehorn's diagnoses of ADHD and with Dr. Whitehorn's evaluation of Plaintiff's ability to maintain social functioning.  The record lacks evidence that the ALJ "pieced together" these expert opinions, that the ALJ supportably resolved conflicts in their opinions, or

122265 (MBB), 2014 WL 12769266, at *15 (D. Mass. Dec. 12, 2014) (remanding where "the ALJ's RFC used at step four and step five lacked substantial evidence because the ALJ discounted the only mental RFC in the record as well as the other functional assessments of plaintiff's mental impairments."); White v. Colvin, No. 12-CV-419 (SM), 2014 WL 768860, at *4 (D.N.H. Feb. 26, 2014) (remanding case because, by giving only "little weight" and "some weight" to expert opinions, the ALJ "was thereby left with no expert opinion to support the functional limitations contained in her RFC."); Staples v. Astrue, No. 09-440 (P)(S), 2010 WL 2680527, at *3 (D. Me. June 29, 2010) ("The administrative law judge essentially rejected all of these expert reports . . . Thus, in essence, she crafted her finding of the plaintiff's . . . RFC from the raw treatment and assessment evidence of record. The administrative law judge was not qualified, as a layperson, to make that assessment, which should have been entrusted to an expert or experts.").

## D.   The ALJ's Step Five Findings

Based upon the foregoing, assuming the ALJ's RFC assessment is revisited on remand, the ALJ's subsequent findings and conclusions may moot or substantially alter Plaintiff's Step Five challenges. However, to provide additional clarification, the undersigned reviews the ALJ's reliance on the VE's testimony and addresses Plaintiff's remaining arguments.

First, Plaintiff asserts that VE Cogleono's testimony regarding Plaintiff's need to "stand up and stretch" created a conflict with her opinion that Plaintiff could have performed work in the

---

explained why one non-examining source was given weight over the other. See Rose v. Shalala, 34 F.3d 13, 18 (1st Cir. 1994) ("We have held that the amount of weight that can properly be given the conclusions of non-testifying, non-examining physicians will vary with the circumstances, including the nature of the illness and the information provided the expert.") (internal quotation marks and citation omitted). Accordingly, with no basis to determine how the ALJ formed his mental RFC assessment, undersigned cannot find that there is substantial evidence to support it. See, e.g., Roberts v. Barnhart, 67 Fed. Appx. 621, 623 (1st Cir. 2003) ("As we have stated, an expert's RFC evaluation is required where the record . . . is sufficiently ramified that understanding it requires more than a layperson's effort at a common-sense functional capacity assessment.") (citation and internal quotation marks omitted).

national economy.  Second, Plaintiff contends that the jobs identified by the VE do not take into account Plaintiff's mental RFC as described by the ALJ at the hearing.

> 1.    The VE's Testimony

Plaintiff contends that the ALJ erred by basing his Step Five determination on the VE's testimony without explaining and resolving the alleged conflict between the VE's opinion that Plaintiff could perform three jobs and the ALJ's hypothetical questioning.  Though the ALJ posed many questions to the VE about a hypothetical person with Plaintiff's background and RFC, Plaintiff primarily contests the ALJ's questioning regarding Plaintiff's need to sit and stand.  At the hearing, the ALJ asked the VE to assume the following:

> [A]t least one-third of the day, on an as needed basis, this person should be able to stand up and do some stretching perhaps at the work place and then go back to work or even possibly, if the job could accommodate, continuation of work without interruption while standing.

[AR 76].

Plaintiff asserts that a reasonable person could interpret this question to mean: (1) that for "at least one-third of the day, [Plaintiff] would be able to stand up and stretch *and then* return to work" or (2) "at least one-third of the day, [Plaintiff] would be able to stand up and stretch *while continuing to work*." [Dkt. No. 15, at p. 16 (emphasis added)].  Plaintiff argues that under the first interpretation, Plaintiff would need to take a break from working for at least one-third of the day creating a direct conflict with the VE's subsequent testimony that an individual off task for more than fifteen percent of the time would be unemployable.  [AR 78-79].

In his motion to affirm, the Commissioner states that there is no distinction between Plaintiff's two proffered interpretations because "an individual who is standing and stretching is *necessarily* engaging in a short break from work to accomplish this task, insofar as it would preclude simultaneous performance of work duties." [Dkt. No. 24, at p. 26 (emphasis in original)].

The Commissioner argues relatedly that "there is no indication in the hearing transcript that the ALJ or VE assumed that the jobs listed by the VE could be performed while standing[.]"  [Dkt. No. 24, at p. 26].  The Commissioner's argument appears to concede that the hypothetical should be interpreted to mean that for at least one-third of the day, while Plaintiff is standing and stretching, he is off task from work.  Compare Myers v. Berryhill, 3:18-CV-30122 (KAR), 2019 WL 3976017, at *10 (D. Mass. Aug. 21, 2019) (VE testified to jobs for a hypothetical individual who "needed to stand for up to two-thirds of the day as needed *without going off task*.") (emphasis added).  Being off-task for one-third of the day does not satisfy SSA regulations.

20 C.F.R. §§ 404.1567(b) and 416.967(b) do not describe a category of light work that can be performed by a person who is off task for at least one-third of the day to stand and stretch. Social Security Regulation 83-12, which defines the sit/stand option, comes into play only when a person is capable of either the six hours of walking/standing or the six hours of sitting that are required to perform one or the other of the two kinds of light-duty jobs that are described in 20 C.F.R. §§ 404.1567(b) and 416.967(b).  In other words, the function of the sit/stand option is to spread the required six hours of walking/standing over more than six hours, not to: (1) allow fewer than six hours of walking/standing to satisfy the six-hour requirement; or (2) decrease the six-hours of walking/standing that is required for most light-duty jobs.  There is nothing in SSR 83-12 to suggest that a sit/stand option may be used to fulfill job requirements as stated in 20 C.F.R. §§ 404.1567(b) and 416.967(b).

Where it is the Commissioner's burden to prove that the claimant is able to engage in occupations that exist in significant numbers in the national economy, the VE's testimony, in light of the Commissioner's concessions, raises substantial questions about the reliability of the ALJ's Step Five findings.  See Seavey, 276 F.3d at 5.  In this case, the Commissioner has not produced

adequate testimony from a VE that explains how any of the three sedentary jobs she identified can be performed by a person who is off task to stand and stretch for at least one-third of the day, insofar as the ALJ's hypothetical is read to mean that.  In the event that this case need not be remanded at Step Three, this case should be remanded to clarify the ALJ's hypothetical and the VE's testimony.[6]

2.   <u>Inconsistency with Dictionary of Occupational Titles</u>

Plaintiff also argues that the ALJ violated Social Security Ruling 00-4P, which states that occupational evidence provided by a VE "generally should be consistent with the occupational information supplied by the DOT" and that, in the face of an "apparent, unresolved conflict," the ALJ must elicit a reasonable explanation before relying on the VE's testimony.  SSR 00-4p, 2000 (Dec. 4, 2000).  As noted above, the VE testified that Plaintiff could perform the work of small parts assembler (Dictionary of Occupational Titles 713.687-018), inspector (Dictionary of Occupational Titles 739.687-182), and packaging sealer (Dictionary of Occupational Titles 559.687-014).  [AR 46].  Each of these positions is categorized as Specific Vocational Preparation Level ("SVP") 2, which corresponds to unskilled work.  <u>See</u> SSR 00-4P.  Here, Plaintiff asserts that the ALJ erred by failing to address a conflict between the VE's testimony that Plaintiff could perform jobs with DOT descriptions of SVP Level 2 despite Plaintiff being limited to jobs that "are taught by demonstration."  [AR 77].

"The DOT defines 'specific vocational preparation' [SVP] as 'the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation.'"  <u>Ahearn v. Astrue</u>,

---

[6] ALJ Stolfo posed a hypothetical to VE Blank at the 2014 hearing which appears to more closely match the sit/stand option as described in SSR 83-12.  [AR 93 ("Let's assume . . . an individual . . . [w]ho could stand and walk for two hours in an eight-hour day and sit for six hours and needs a sit/stand at will option.")].

No. 06-94 (B)(W), 2007 WL 951562, at *2 (D. Me. Mar. 27, 2007) (quoting Dictionary of Occupational Titles Appendix C, § II), aff'd, 2007 WL 1309557 (D. Me. May 2, 2007).  SVP Level 2 work is "[a]nything beyond short demonstration up to and including one month to learn" whereas SVP Level 1 work is limited to a "[s]hort demonstration only."  See Dictionary of Occupational Titles Appendix C, § III.

By the DOT's own language, SVP Level 2 work can be taught with a short demonstration. Despite the ALJ's inclusion of SVP Level 1 language in his hypothetical, it is reasonably apparent from his colloquies that he meant to limit Plaintiff to jobs corresponding to "unskilled" work.  See SSR 00-4P ("Using the skill level definitions in 20 C.F.R 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT").  While his inclusion of language from SVP Level 1 is surplusage, it is not illogical.  It merely makes explicit what is implicit in the progressive structure of the SVP levels: that a person capable of performing work at Level 2 would also be capable of performing work at the lower level of Level 1.  See Saia v. Barnhart, Civ.A.03-11989 (RWZ), 2005 WL 152126, at *3 (D. Mass. Jan. 25, 2005) (citing SSR 00-4 ("The DOT lists maximum requirements of occupations as generally performed, not the range of requirements of a particular job as it is performed in specific settings.")); see also Felix v. Astrue, EDCV 11-925 (OP), 2012 WL 424381, at *3 (C.D. Cal. Feb. 9, 2012) ("[T]he SVP level is a measure that helps to classify any given occupation (20 C.F.R. § § 404.1568(a))—it is not a level that must be met by any specific plaintiff in order to be deemed capable of performing that category of work.").  As a result, there is no conflict between the VE's testimony and the ALJ's question.  Therefore, there was no error in the ALJ's reliance on the VE's testimony in this regard.

## <u>CONCLUSION</u>

For the reasons set forth above, I recommend that Commissioner's motion to affirm his prior decision [Dkt. No. 23] be DENIED, and I recommend that Plaintiff's motion to reverse be GRANTED [Dkt. No. 15].  On remand, the ALJ should further investigate Plaintiff's residual functional capacity and obtain supplemental evidence from a VE to clarify Plaintiff's assessed functional limitations.


<u>/s/ David H. Hennessy</u>
David H. Hennessy
U.S. Magistrate Judge